IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

DWORAK V. SHAMROCK HILLS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JERED DWORAK AND MARANATHA SALES GROUP LLC, A NEBRASKA LIMITED LIABILITY COMPANY, APPELLEES,

V.

SHAMROCK HILLS LLC, A KANSAS LIMITED LIABILITY COMPANY, APPELLANT, AND

GAREN ARMSTRONG ET AL., APPELLEES.

Filed March 3, 2026.   No. A-25-244.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed as modified.

Heather Voegele and Andreanna Smith, of Voegele Anson Law, L.L.C., for appellant.

Brian S. Koerwitz, of Peetz Koerwitz & Lafleur, P.C., L.L.O., for appellees.

RIEDMANN, Chief Judge, and PIRTLE and FREEMAN, Judges.

PIRTLE, Judge.

### INTRODUCTION

Shamrock Hills LLC (Shamrock) appeals a jury verdict in favor of Jered Dworak and Maranatha Sales Group LLC (MSG) (collectively the plaintiffs) for breach of contract and willful non-payment of wages. Shamrock alleges that the district court for Lancaster County erred in giving an incomplete jury instruction, erred in the amount of prejudgment interest awarded, erred in denying Shamrock's motion for directed verdict on MSG's claim for breach of contract, and erred in denying Shamrock's motion to vacate judgment and motion for new trial. For the reasons stated herein, we affirm as modified.

- 1 -

BACKGROUND

Shamrock is a roofing and construction company, based in Kansas, with an office in Lincoln, Nebraska. In May 2020, Dworak became an independent contractor for Shamrock. While an independent contractor for Shamrock, Dworak formed Salt Creek Sales LLC, with a partner. Salt Creek Sales then became an independent contractor for Shamrock. Subsequently, Dworak's partner and Salt Creek Sales left Shamrock, and Dworak formed MSG, another LLC, to serve as an independent contractor for Shamrock. Independent contractors for Shamrock were responsible for talking to homeowners, working with insurance companies, getting contracts signed, managing projects, and collecting payment.

In January 2022, Dworak accepted an offer by Shamrock to become a branch manager in his individual capacity. Dworak received an annual base salary of $50,000 for his work as a branch manager. MSG was also to receive a 50 percent commission of the gross profit on all personal MSG jobs. On August 16, Dworak was terminated as a branch manager, and MSG's independent contractor relationship with Shamrock was also terminated. Following their termination, the plaintiffs filed a complaint against Shamrock.

MSG alleged claims for breach of contract, tortious interference with a business relationship, misappropriation of trade secrets, and unjust enrichment. Dworak alleged a claim for violation of the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. §§ 48-1228 to 48-1236 (Reissue 2021). However, the only issues presented to the jury were MSG's claims for breach of contract and unjust enrichment, and Dworak's claim for willful non-payment of wages.

The plaintiffs alleged Shamrock breached its contract with MSG by failing to pay MSG's commissions. The plaintiffs alleged that the total amount of damages owed to MSG was $438,302.25. Alternatively, the plaintiffs alleged that MSG should be paid for the work it performed, and the reasonable value of MSG's efforts was not less than $426,825.55. Lastly, the plaintiffs alleged that following Dworak's termination as a branch manager, Shamrock failed to pay Dworak for the last week he worked for Shamrock. The plaintiffs asserted that the total amount of wages due was not less than $961.54.

At trial, Dworak's branch manager proposal from Shamrock was entered into evidence. Under compensation, the proposal stated that Dworak would receive a $50,000 annual salary, a 50 percent commission of the gross profit on all personal MSG jobs, and a one-half percent of total gross residential sales paid quarterly. Shamrock's president, Thomas McMahon, testified that there was nothing in the proposal that restricted MSG's right to receive commissions. He also testified that a project becomes a "job" when there is a signed contract.

Other documents which were produced and relied on in support of MSG's allegations included commission reports and calculations of the amount of commissions MSG was owed and when payment was received. On April 7, 2023, Shamrock collected payment for the last personal MSG job.

McMahon testified at trial that "including 50 [percent] commission on gross profit" for MSG jobs was intended to "sweeten the pot" to get Dworak to accept the branch manager position. McMahon also stated that there was nothing in the agreement with MSG that limited MSG's right to payment of commissions to jobs that were just closed.

McMahon testified that MSG was an independent contractor for Shamrock and he was aware there were other independent contractors who worked for MSG. McMahon testified that MSG was promised 50 percent commission on MSG jobs, but that Shamrock was going to take the money contracted to MSG and pay MSG's independent contractors directly. McMahon stated that after he terminated Dworak, he sent him a follow-up email discussing their business relationship moving forward. The email reiterated that Dworak would no longer be a branch manager and Dworak was to remain as a project manager. The email also said that independent contractors who worked for MSG could work for Shamrock. McMahon testified that he intended to pay the independent contractors, who left MSG, with the commissions that should have been paid to MSG.

McMahon testified that Dworak responded to the email, indicating that he would like to recoup his costs by having any completed jobs paid to MSG. McMahon replied that Shamrock's position moving forward would not change. Dworak responded again addressing concerns that MSG independent contractors were being told that Dworak no longer worked for MSG and that the MSG contractors had no other choice but to become Shamrock independent contractors. McMahon replied and terminated Dworak and MSG as independent contractors for Shamrock.

McMahon testified that prior to terminating Dworak and MSG, Shamrock cut off Dworak's access to Acculynx. Acculynx is the program that independent contractors for Shamrock used to input project information, check the status of their jobs, and see payment information. After this, Dworak did not have access to any financial information relating to the commissions owed to MSG; however, he had a list of customers MSG procured contracts for on Shamrock's behalf prior to their termination. Using these records, Dworak issued discovery requests relating to those specific jobs, and Shamrock repeatedly delayed providing documents.

McMahon also agreed that on August 17, 2022, he paused all payments to Dworak and MSG. McMahon specifically stated, "We can pay the actual project managers who did the job. All payments to [Dworak] are on pause." McMahon testified that MSG independent contractors, who did not leave to work for Shamrock, were not paid for their work.

McMahon also said that he would have paid MSG had he not been upset with Dworak. McMahon had heard that individuals at Shamrock were concerned about Dworak's behavior and that Dworak had disparaged Shamrock. McMahon testified that Shamrock did not pay Dworak's wages for his last week of work for two years. McMahon also admitted that in response to the plaintiffs' requests for admissions, Shamrock falsely denied the fact that it did not pay Dworak for his last week of work. Shamrock paid Dworak his last week of wages on the first day of trial, having denied that they owed him wages for two years. McMahon also admitted at trial that Shamrock denied several other requests for admissions which he knew were true.

Aaron Gedminas, Dworak's supervisor, testified that Cullin Bloom, who was at the time an MSG independent contractor, came to him because he was "not happy" with Dworak and MSG. Gedminas also told the court that Bloom showed him MSG's prospect tracker. However, Bloom testified that he never had that conversation with Gedminas. Bloom also testified that he never showed Gedminas MSG's prospect tracker.

At the close of the plaintiffs' evidence, Shamrock moved for a directed verdict. The court denied the motion. After Shamrock rested, it again moved for a directed verdict, and the court reaffirmed its prior ruling.

The jury returned a verdict in favor of MSG and Dworak on the claims of breach of contract and willful nonpayment of wages.

Dworak and MSG filed a postverdict motion and notice of hearing in which they asserted a claim for prejudgment interest. At the hearing on the motion, the plaintiffs provided three dates they believed the district court could use as a starting date for prejudgment interest: August 16, 2022, the date that Dworak was terminated; April 7, 2023, the date that Shamrock collected payment for the last MSG job; or October 7, 2022, the date that the complaint was filed.

On January 31, 2025, the district court awarded prejudgment interest from the date of the return of summons after the filing of the lawsuit, October 14, 2022. On February 10, Shamrock filed a motion to set aside the judgment and for a new trial. On March 3, the court denied the motion.

Shamrock appealed.

## ASSIGNMENTS OF ERROR

Shamrock assigns that the district court erred in (1) giving an incomplete version of jury instruction No. 8, (2) the amount of prejudgment interest it awarded, (3) denying Shamrock's motion for directed verdict on MSG's claim for breach of contract, and (4) denying Shamrock's motion to vacate judgment and for new trial.

## STANDARD OF REVIEW

Whether a jury instruction is correct is a question of law, which an appellate court independently decides. *J.R.M.B. v. Alegent Creighton Health*, 319 Neb. 287, 21 N.W.3d 678 (2025).

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*

Awards of prejudgment interest are reviewed de novo. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party. *Pantano v. American Blue Ribbon Holdings*, 303 Neb. 156, 927 N.W.2d 357 (2019).

## ANALYSIS

*Jury Instruction.*

First, Shamrock assigns that the district court erred in giving an incomplete version of jury instruction No. 8. Jury instruction No. 8 stated:

> The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. A violation of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract.

Shamrock argues that the district court erred in failing to include the "at-will exception" in the jury instruction and that the failure to include it prejudiced Shamrock. Brief for appellant at

12. A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings, and which are supported by competent evidence. *First National Bank North Platte v. Cardenas*, 299 Neb. 497, 909 N.W.2d 79 (2018). To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the failure to give the requested jury instruction. *Id*. It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given. *Id.*

At the jury instruction conference, Shamrock objected to the instruction, arguing that it excluded the portion of the instruction that indicates that in an employee situation, there is no guaranteed term of employment in Nebraska, that it is an at-will relationship. And, therefore, good faith and fair dealings did not apply in relation to MSG's termination. The court replied,

> The implied covenant of good faith and fair dealing applies to all contracts in Nebraska, with some limited exceptions. The at-will employment is a rule of Nebraska law that has its roots in the employment relationship. Although independent contractors are often discussed as being employed by the general contractor, the relationship is distinct from the traditional employer-employee relationship and when the at-will employment terminology is used, it is in that context. It's not used in the independent contractor context.

We agree with the district court that the at-will employment terminology is used in the context of an employer/employee relationship. In *Dibbern v. York Surgical Assocs.*, 318 Neb. 928, 20 N.W.3d 90 (2025), the court held that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. Similarly, in *Stratton v. Chevrolet Motor Div.*, 229 Neb. 771, 428 N.W.2d 910 (1988), relied on by Shamrock, the court held, except in cases where an employee is deprived of constitutional or statutory rights or where contractual agreements guarantee that employees may not be fired without just cause, there is no implied covenant of good faith or fair dealing in employment termination.

MSG, an LLC, was an independent contractor for Shamrock, not an at-will employee. MSG hired its own individuals as independent contractors to do the work on the jobs. Additionally, this was a breach of contract case rather than a wrongful termination case. At-will employment was not applicable here. Therefore, Shamrock's additional jury instruction language was not a correct statement of the law nor was it warranted by the evidence.

In addition, there was evidence to support that Shamrock acted in bad faith in denying the commissions to Dworak under his compensation plan. A violation of the covenant of good faith and fair dealing occurs when a party violates, nullifies, or significantly impairs any benefit of the contract. *Id.*

The record reflects MSG was an independent contractor for Shamrock, was terminated, and was not paid the commissions owed it under the terms of the contract. The record shows that Shamrock cut out MSG, intending to pay the independent contractors that left MSG for Shamrock with the money promised to MSG. The record also reflects that Shamrock would have paid MSG but for McMahon's disapproval of Dworak's response to his termination. Shamrock put all payments to MSG on pause and did not pay Dworak wages he was owed until the first day of trial,

even though they denied their failure to pay in a discovery response. Therefore, we find that the tendered instruction of "without incurring liability" is not warranted by the evidence, given that MSG was an independent contractor rather than an at-will employee, that this is a breach of contract case, and that Shamrock acted in bad faith.

Accordingly, we find that the jury instructions provided by the district court were proper.

*Prejudgment Interest.*

Next, Shamrock assigns the district court erred in the amount of prejudgment interest it awarded. Specifically, Shamrock asserts that prejudgment interest should have begun to run on June 24, 2024, at the earliest, as that is the date MSG provided its damage calculation to Shamrock.

The district court awarded prejudgment interest on the amount of the principal verdict of $222,739.68 at the rate of 12 percent per annum. The court set October 14, 2022, as the beginning date for prejudgment interest, the date of the return of summons after filing the lawsuit. The court made this determination as it found there was an "absence of additional evidence on the date of origination of the claim." This amounted to 840 days, totaling $61,476.15.

Neb. Rev. Stat. § 45-104 (Reissue 2021) states:

Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment.

As stated above, the district court determined that October 14, 2022, was the appropriate date to begin calculation of prejudgment interest.

However, § 45-104 allows prejudgment interest to run "on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment," which has been construed to be from the time that money is wrongfully withheld. See *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). In addition to October 14, 2022, MSG provided other dates that interest could begin to run, including April 7, 2023, the last date any payment from a homeowner was paid to Shamrock, and August 16, 2022, the date of Dworak's termination. Dworak also offered the date the complaint was filed, October 7, 2022.

The jury found that Shamrock breached its contract with MSG. Shamrock's contract with MSG stated "50% commission of Gross Profit on all personal (MSG) jobs." The plain language of this provision establishes that MSG was to receive a 50 percent commission of the gross profit on all MSG jobs. When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meanings as an ordinary or reasonable person would understand them. *Main St Properties LLC v. City of Bellevue*, 318 Neb. 116, 13 N.W.3d 911 (2024). Gross profit is the total sales revenue less the cost of the goods sold; no adjustment being made for additional expenses and taxes. See Black's Law Dictionary (12th ed. 2024).

Considering that prejudgment interest is to run from the time that money is wrongfully withheld, we find that the district court's starting date for prejudgment interest was incorrect. The

written instrument found to be a contract stipulated that MSG would receive 50 percent commission of gross profit on all personal MSG jobs. For Shamrock, as soon as a contract was signed, it was considered a job. This means that after Shamrock was paid for jobs secured by MSG, MSG would be paid a commission based on the sale without an adjustment of additional expenses or taxes. There was nothing in the contract that limited the right to payment of commissions to jobs that were completed or "closed." Shamrock paid its commissions when everything had been completed and the jobs capped out, closed, and had been collected.

After MSG's termination, MSG was still entitled to 50 percent commission of the gross profits on all personal MSG jobs; however, Shamrock paid commissions after it collected final payment for the job, meaning that Shamrock would not be in breach of contract by withholding commissions until the job had been paid for completely. The nature of the work is roofing and construction, where one job may be paid for earlier depending on various factors. It would be inappropriate to run interest on the total award when all MSG jobs had not been completed and collected, until long after October 14, 2022.

The total amount of commissions owed to MSG was not withheld until the last MSG job was paid to Shamrock. The record identifies that date with precision to be April 7, 2023. Therefore, the correct date for prejudgment interest to run would be April 7, as that was the last date any payment from a homeowner was paid to Shamrock for a MSG job, and at that point the money was received and withheld from MSG. We conclude that the district court erred in calculating prejudgment interest by using the wrong starting date. The correct number of days would be from April 7, 2023, to February 3, 2025, the date of the final judgment, which is 668 days. We therefore find that Dworak is entitled to $48,917.30 in prejudgment interest and modify the award accordingly.

*Motions for Directed Verdict, to Vacate Judgment, and for New Trial.*

Lastly, Shamrock assigns that the district court erred in denying its motions for a directed verdict, to set aside judgment, and for a new trial. Shamrock argues that there was no evidence to support a breach of contract claim as there was not a contract or a meeting of the minds between the parties. Shamrock asserts that the verdict reached by the jury was not sustained by sufficient evidence, and on that basis, the verdict should be vacated and a new trial granted.

In a civil case, a directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *State v. Ichtertz*, 320 Neb. 159, 26 N.W.3d 504 (2025). Nebraska courts have often explained:

> In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

*Id.* at 170-71, 26 N.W.3d at 515. It is well settled that if there is "any evidence" which will sustain a finding for the party whom the motion for directed verdict is made, the case may not be decided

as a matter of law. *Id.* at 171, 26 N.W.3d at 516. Stated differently, "if reasonable jurors could find facts that would allow the nonmoving party to prevail, a directed verdict should not be granted." *Id.*

To recover for breach of contract, a plaintiff must prove that a defendant made a promise, breached the promise, and caused the plaintiff damage and that any conditions precedent were satisfied. *Fast Ball Sports v. Metropolitan Entertainment*, 21 Neb. App. 1, 835 N.W.2d 782 (2013). A contract may be express, implied, written, or oral. To establish an express contract, a party must prove a "definite proposal and unconditional and absolute acceptance" of that proposal. *Id.* at 8, 835 N.W.2d at 789.

With this standard in mind, there was evidence to support the jury finding that there was a contract between MSG and Shamrock. Shamrock offered Dworak a position as branch manager in Lincoln, Nebraska. The offer listed under compensation that MSG would receive a 50 percent commission of the gross profit on all personal MSG jobs. MSG was an independent contractor for Shamrock at the time, and Dworak was the sole owner of MSG. McMahon testified that he offered this payment to "sweeten the pot." McMahon also testified that a job is created when there is a signed contract with a homeowner. McMahon acknowledged that Dworak accepted this offer, and that subsequently Dworak was fired and payments were withheld from him.

We find the court did not err in overruling the motion for a directed verdict at the close of the plaintiffs' case and at the close of all the evidence, as there was sufficient evidence for a jury to find that Shamrock had breached a contract with MSG.

Shamrock also argues that its motion to set aside the judgment and motion for new trial should have been granted because MSG did not present sufficient evidence to support the jury's verdict that Shamrock breached a contract with MSG. Based on the evidence set forth above, we conclude that MSG presented competent evidence upon which the jury could find that Shamrock breached a contract with MSG. Therefore, the district court did not abuse its discretion in overruling Shamrock's motion to set aside judgment and motion for new trial.

CONCLUSION

For the reasons set forth above, we conclude that the district court properly instructed the jury and did not abuse its discretion in denying the motion for directed verdict, motion to vacate judgment and motion for new trial. We also conclude that prejudgment interest was properly awarded pursuant to § 45-104, but was incorrectly calculated. We modify the amount of prejudgment interest to $48,917.30, and otherwise affirm the judgment as modified.

AFFIRMED AS MODIFIED.